**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-1496

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

TONY LYNN BAILEY,

Claimant - Appellant,

v.

CURRENCY, U.S., $147,900.00,

Defendant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. James A. Beaty, Jr., Chief District Judge. (1:06-cv-00197-JAB-PTS)

Argued: September 22, 2011          Decided: October 14, 2011

Before MOTZ, GREGORY, and SHEDD, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

**ARGUED:** John Carl Vermitsky, MORROW PORTER VERMITSKY & FOWLER, PLLC, Winston-Salem, North Carolina, for Appellant.  Lynne P. Klauer, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Benjamin D. Porter, MORROW ALEXANDER PORTER & WHITLEY, PLLC, Winston-Salem, North Carolina, for Appellant.  Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this civil asset forfeiture action, police officers seized $147,900.00 in United States Currency from Tony Lynn Bailey's property while executing a search for controlled substances. The district court granted the Government's motion for summary judgment, awarding it all of the seized currency. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

On December 12, 2005, officers with the Davidson County Sheriff's Office, following up on tips from the community, executed a controlled buy of prescription drugs from Bailey at his home. Under the supervision of two detectives, a confidential informant, who stated that he had previously obtained prescription drugs from Bailey, went to Bailey's home and returned with hydrocodone pills from Bailey.

Detective Jeff Jones then applied for, received, and executed a search warrant for Bailey's home. Under the sink in the bathroom, the officers found approximately fifteen pills that were not in a prescription bottle, several items matching the description of the stolen property that the informant purportedly had given Bailey in exchange for prescription pills, and eight firearms. In a dresser drawer, the officers found

$9,000.  Finally, in an outbuilding, the officers found seven more firearms and fourteen rubber-banded stacks of $100 bills in a large green safe.

Following the search, Detective Jones interviewed Bailey after he waived his <u>Miranda</u> rights.  Bailey signed a statement attesting that he sold prescription pills to pay for his bills and medication, but that he had sold "less than 500 pain/nerve pills."  Further, he stated that, although unemployed, he performed odd jobs to make money.  Bailey maintained that he had inherited the $100 bills found in the green safe in the outbuilding from his father in "1993 or 1994."  Detective Jones observed that some of those $100 bills were dated from the late 1990s and 2000 and, therefore, the Detective suspected Bailey had lied about the source of the currency found in the safe.  As a result, Detective Jones confiscated all of the currency, <u>i.e.</u>, that found in the safe and the $9,000 found in Bailey's dresser drawer.

A count of the seized currency yielded a total of $147,900.  An official at the Federal Reserve Bank of New York subsequently reviewed the currency and concluded that the age of the bills varied widely, with some of the bills dating from as early as the 1950s.  More than half of the bills, however, were released into general circulation after the death of Bailey's father on May 2, 1994.

The 2005 search was not Bailey's first run-in with law enforcement. In 2001, officers with the Davidson County Sheriff's Office executed a controlled buy of prescription drugs from Bailey at the same home. In a subsequent search of his home and outbuildings, the officers seized ten firearms, twenty-five units of Alprazolam, 2,128 grams of marijuana, boxes of plastic bags, a set of digital scales, and $33,100. Bailey was arrested and charged with various state narcotics offenses, but he was not convicted of any crime.[1]

On February 28, 2006, the Government filed this civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C) and sought an in rem arrest warrant for all of the currency found during the December 12, 2005 search of Bailey's home and outbuildings. After the district court initially denied the warrant, the Government filed an amended complaint and arrest warrant, which the court granted on November 16, 2006. Bailey filed a claim to the currency. After discovery, Bailey and the Government each moved for summary judgment. On March 31, 2009, the district court granted the

---

[1] The Government filed a forfeiture action with respect to the $33,100 seized and settled the action on terms favorable to Bailey: $20,051.50 to Baptist Hospital for Bailey's outstanding medical bills; $5,694.00 to Bailey's girlfriend who claimed that those funds represented her tax refunds; $395.00 to the United States in costs related to the action; and $6,959.50 back to Bailey.

Government's motion and denied Bailey's. Most relevant to this appeal, the court held that, as a matter of law, the Government had met its burden of showing by a preponderance of the evidence that all of the currency in question was subject to forfeiture. Bailey timely noted this appeal.

## II.

Federal law provides that currency traceable to the exchange of controlled substances is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 881(a)(6). In 2000, Congress passed the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202 ("CAFRA"), which modified the burdens of proof in civil forfeiture proceedings. Prior to CAFRA, the Government had the initial burden of demonstrating probable cause that property was subject to forfeiture. See United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir. 1990). The burden then shifted to the claimant to establish, by a preponderance of the evidence, that the property at issue was not acquired in violation of the law or linked to unlawful activity. Id. CAFRA eliminated this burden-shifting framework; it put the burden solely on the Government and raised the quantum of proof to a preponderance of the evidence. 18 U.S.C. § 983(c)(1) ("[T]he burden of proof is on the Government to

6

establish, by a preponderance of the evidence, that the property is subject to forfeiture.").

In a forfeiture proceeding, we review the district court's factual findings for clear error, but review de novo the legal determination of whether those facts render the property at issue subject to forfeiture. See United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004). In determining whether the Government has met its burden, courts should not view each piece of evidence in isolation, but rather "consider the totality of the evidence as a whole and in the appropriate context." United States v. Funds in the Amount of $30,670.00, 403 F.3d 448, 469 (7th Cir. 2005).

A district court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court should not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, the court "must view the evidence presented through the prism of the substantive evidentiary standard." Id. at 254.

III.

Bailey initially challenges the Government's evidence as insufficient to connect the seized currency with his alleged drug activities. The district court disagreed, and so do we.

First, Bailey has a history of involvement with illegal drugs.[2] The Government presented uncontroverted evidence that drugs were found on Bailey's property in both 2001 and 2005, providing a sound basis for the district court's finding that the Government had presented "significant evidence of [Bailey's] substantial involvement in the sale of controlled substances for several years." United States v. $147,900.00 in U.S. Currency, 2009 WL 903356, Civ. No. 06-197 (M.D.N.C. Mar. 31, 2009).

_____

[2] To demonstrate Bailey's involvement with drugs, the Government presented hearsay evidence, primarily regarding his involvement prior to 2005. Bailey did not object to the hearsay in the district court. Indeed, he does not clearly object to the admissibility of that evidence before us. Instead, he argues generally that the Government offers "little more than rank hearsay . . . to support [its] allegation that the Claimant engaged in drug trafficking for a long period of time;" thus, his argument appears to dispute the sufficiency, rather than the admissibility, of the Government's evidence. Accordingly, we assess the admissibility of the hearsay evidence only for plain error. Fed. R. Evid. 103(a), (d). Given that courts routinely permitted the Government to rely on hearsay evidence in forfeiture proceedings prior to CAFRA, and only one appellate court has explicitly recognized that hearsay evidence is no longer admissible following CAFRA, see United States v. $92,203.00 in U.S. Currency, 537 F.3d 504, 510 (5th Cir. 2008); but see United States v. $291,828.00 in U.S. Currency, 536 F.3d 1234, 1237 (11th Cir. 2008), we cannot hold admission of the evidence to be plain error.

Furthermore, Bailey's possession of large sums of cash at the same time as his engagement in drug activity provides "strong evidence that the cash is connected with drug activity." $84,615 in U.S. Currency, 379 F.3d at 501-02; see also United States v. $252,300.00 in U.S. Currency, 484 F.3d 1271, 1275 (10th Cir. 2007) ("A large amount of currency, while not alone sufficient to establish a connection to a drug transaction, is 'strong evidence' of such a connection." (quoting United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 877 (10th Cir. 1992)).

Finally, Bailey has no reported income or work history that could explain the large amount of currency in his possession. See United States v. $174,206.00, 320 F.3d 658, 662 (6th Cir. 2003) (holding that "evidence of legitimate income that is insufficient to explain the large amount of property seized" satisfies the preponderance of the evidence standard).

Taken together, this is sufficient, albeit not overwhelming, evidence that some of the currency seized from Bailey's property is connected to his drug activities.

IV.

The district court erred, however, in viewing the above evidence as sufficient to grant summary judgment to the Government as to all of the currency found on Bailey's property.

9

A.

Police seized the vast majority of the currency here -- $138,900 in $100 bills -- from a green safe in Bailey's outbuilding. In deposition, Bailey swore that he inherited all of this currency from his father and had buried it in his backyard in glass jars. He stated that he dug up the jars only occasionally and had never exchanged the currency for more recently issued currency. Under most circumstances, such testimony of a legitimate source would suffice to create a genuine dispute of material fact as to the entire sum.

In this case, however, undisputed record evidence requires rejection of Bailey's testimony as to a legitimate source for a portion of the currency. See Scott v. Harris, 550 U.S. 372, 380 (2007). More than half of the seized currency was not in circulation at the time of the death of Bailey's father on May 2, 1994. Thus, because this "new" currency plainly cannot be part of an inheritance from his father, Bailey's testimony about his inheritance cannot create a genuine dispute as to the source of this "new" currency. And, given that in deposition, Bailey swore that the currency in the safe consisted exclusively of an inheritance from his father, he cannot now contend that this "new" currency came from any other legitimate source. Cf. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Moreover, that Bailey plainly lied about the source

10

of this "new" currency constitutes additional probative evidence that the currency is connected to criminal behavior. See United States v. $67,220.00 in U.S. Currency, 957 F.2d 280, 286 (6th Cir. 1992). Accordingly, with respect to this "new" currency, we affirm the district court's grant of summary judgment to the Government.

B.

The currency found in the safe that was released into general circulation before the death of Bailey's father on May 2, 1994 presents a different question. No record evidence requires rejection of the possibility that Bailey inherited this "old" currency from his father.[3]

To the contrary, the record lends some support to Bailey's inheritance claim. First, Bailey's former girlfriend, Sherry Richie, testified under oath that she accompanied Bailey when he retrieved the inheritance money from his father's property and that Bailey then kept the money buried in glass jars in his backyard. Second, the age of the "old" currency

---

[3] At oral argument and in his brief, counsel for Bailey stated that $54,600 of the seized currency consisted of bills that pre-dated 1994. The Government has not disputed this figure. But the record contains no factual finding on this point. On remand, we leave it to the district court to determine the precise amount of the "old" currency, i.e, currency seized from Bailey's safe that was released into circulation prior to May 2, 1994.

11

suggests it could be an inheritance. According to the Government's own expert from the Federal Reserve Bank, the average lifespan of a $100 bill is eighty-nine months (or seven years and five months). Of course, we recognize the difficulty in deriving significance from a mathematical average without further information as to context, but a fact-finder could find this testimony relevant and persuasive. With an average lifespan of eighty-nine months, bills released into circulation prior to May 2, 1994 would not normally be in circulation at the time of the Government's seizure of the currency in 2005. And yet, some of the seized bills are several decades old. Bailey's purported practice of keeping his inheritance buried underground in jars and out of the bank could explain the age of this "old" currency.

Of course, a fact-finder could determine that Bailey and his ex-girlfriend lied and the age of the "old" currency is immaterial. But these are questions to be determined by a fact-finder. Accordingly, we reverse the district court's grant of summary judgment to the Government with respect to the forfeiture of the "old" currency found in the safe.

C.

Bailey has also established a genuine dispute of material fact as to the source of the $9,000 that the police

12

officers found in his dresser drawer.  In deposition, Bailey testified that this money derived from a 1966 Mustang, which he bought at an auction, fixed up, and then sold to a man named Tony.

The district court rejected this testimony as uncorroborated.  But corroboration is not necessary to establish a genuine dispute of material fact.  Cf. Berry v. Chicago Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010) (holding that uncorroborated testimony from a non-movant at summary judgment can be evidence of disputed material facts if the testimony is based on personal knowledge or firsthand experience); see also Liberty Lobby, 477 U.S. at 255 (noting that juries, not judges, must weigh evidence and determine the credibility of testimony).

Bailey's testimony about this transaction was specific and consistent with his other statements that he occasionally purchased and sold cars to make money.  Moreover, the $9,000, which was kept separate and apart from the currency in the safe in the outbuilding, is not an amount that on its own would suggest linkage to drug activity.  See United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1072 (9th Cir. 1994).  Therefore, the district court erred in granting summary judgment to the Government as to this $9,000.

V.

For the foregoing reasons, we affirm the judgment of the district court with respect to the "new" currency found in the safe, but reverse the judgment of the district court and remand for further proceedings to determine whether the following currency is subject to forfeiture:   (1) the "old" currency found in the safe, i.e., currency that was released into general circulation prior to May 2, 1994; and (2) the $9,000 found in Bailey's dresser drawer.[4]

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

---

[4] The district court noted that the Government co-mingled the bills found in the dresser drawer with the bills found in the safe.   If the Government is unable now to determine which bills were found in the safe, on remand, the district court should assume that all of the "old" bills were found in the safe and the $9,000 in the dresser drawer consisted of "new" bills.